Equal justice under law. This is a statement that's on the U.S. Supreme Court building, which I had the privilege to visit this past summer. And in the gift shop of the U.S. Supreme Court, there's a statue of Lady Justice holding a set of scales in her outstretched hand and a sword in her right hand and scales in her left hand, and she's blindfolded. Blindfolded because it's to denote impartiality. And what we're asking for here is an impartial enforcement of the law with respect to a motion for summary judgment. We believe that if the court will apply the law impartially without regard to which side is basically at the plate, we think that the summary judgment motion should be reversed in the case remanded. Summary judgment motion is a very complex mechanism. I suppose the easiest procedural posture for ruling on one is in one case in which there's an unverified complaint, an unverified answer, very thin file in the district court transcript or record, and a simple motion for summary judgment with properly authenticated exhibits, properly notarized or properly authenticated and verified affidavits and supports, no opposition, no written opposition whatsoever, in which case the court will base, could in its discretion, take the matter off calendar for I think that is the situation that we had in Jacobson versus Filler, where there was no opposition filed, no issue about the properly authenticated exhibits, no issue as to competent testimony being offered by the parties in that case. In this case, we have improperly authenticated exhibits, untimely filed exhibits, and incompetent evidence offered by the attorney for the appellees and city defendants. I submit that in a motion for summary judgment, the purpose for this is to see whether or not prior to trial there's any issue of disputed material facts such that based on the undisputed material facts, one side or the other is entitled to judgment as a matter of law. And I submit that if this isn't indeed a preliminary trial, so to speak, then it would be plain error for a judge to allow an attorney to testify competently as to the facts in which the party that the attorney represents, as to the facts underlying the case. If the attorney were to take the witness stand and start testifying about the facts and start authenticating exhibits that the party itself that the attorney represents should be authenticating, should be testifying about, but does not, it would be plain error for that judge to rule in favor of that side. It would also be plain error for the judge to consider untimely filed exhibits. That is a situation that we have here for improperly authenticated exhibits. And I think the Ninth Circuit or this court in Howe Road Studios has asked us to brief that issue in its application to this case. Howe Road Studios involved this situation where there is in fact proper authentication by the moving party of an S-1 registration statement in connection with a motion for reconsideration that was filed in addition to the fact that both sides had submitted to the court a copy of this S-1 registration statement. And indeed one of the copies submitted by the non-moving party showed a conformed stamp showing it received by the SEC. Mr. Galla, am I correct that the record that was before the trial court here included the declaration of the officer, I guess it's Officer Moynihan, the defendant? Yes, it did. And why wouldn't that declaration be properly admissible and properly considered by the district court in looking at the basis for summary judgment? That declaration is properly admissible and can be properly considered by the district court. I have no issue with that. All right. And is it your position that that declaration is insufficient to establish the justification for taking this bias into custody? Yes, and as to certainly as to both incidents, yes. And I would also say that it is... The question is whether or not it's enough to establish the probable cause or the reason why the officer acted in the manner that he did. And I guess procedurally the problem that I see you have here is that there was no opposition that was filed to contest, no factual opposition that was filed to contest what the officer was saying. Is that right? There was opposition filed, Your Honor. There was written opposition filed. Okay, but it wasn't sworn or... It was not sworn. So it wasn't in the proper form, basically. That is correct. All right. Ms. Bias was representing herself pro se, did not have the verification sworn under penalty of perjury at the end of any of her papers submitted in opposition. In order to rule in her favor, we would have to make an exception to the normal rules that let it slide, so to speak. I don't think that's a requirement, Your Honor. I believe there's several points that I want to address, one of which is that the moving papers themselves of the city defendants and appellees contained selected portions of the deposition transcript of Ms. Bias, which was in my excerpts of record, page 160, lines 9 and 10, show that Ms. Bias testified under oath that she had never met Moynihan before the second incident, and it does raise a disputed issue of material fact as to whether Mr. Moynihan had any personal contact with Ms. Bias in connection with the first incident. Secondly, I think... I'm sorry, perhaps I'm misunderstanding a point. Is she disputing that there were two separate admissions to the hospital? No, she is not disputing that. Okay, so the contested issue would be with regard to whether it was Officer Moynihan who took her into custody on the first occasion? Yes, and whether Mr. Moynihan had probable cause to detain her under Section 5150 of the California Health and Welfare Institution's curve, and whether he had set forth sufficient facts that would lead an objective, reasonable person to conclude that he had a basis for concluding that this person was a danger to himself or herself or others, and absent contact with her, absent the letter that she supposedly wrote to Judge Burr, absent... She admitted in deposition that she'd actually written the letter, didn't she? She admitted that she wrote a letter to Judge Burr. Well, there's only one letter in the record. Is there more than one letter? Well, I believe there's only one letter to Judge Burr in the record. In the record. But there are a number of letters that she wrote, I think one of them at least, to the city of San Leandro, just giving notice of her claim. And I think that's the letter that was mistakenly attached to Ms. Stewart's declaration in the initial moving papers. I guess the... So the point would be, does the application for detention, which again was also improperly authenticated, and absent that for consideration by the district court in either of the two incidents, has the moving party made a sufficient showing that they had probable cause that would justify an objective person to conclude there were sufficient facts that this person is dangerous? I don't... I don't believe that to be the case. Did you want to take some time for rebuttal? Yes, Your Honor. All right. Very good. Let's hear then from Ms. Hines. Good morning, Your Honors. May it please the Court. My name is Trish Hines, and I represent the appellees, Officer Moynihan, Chief Kitchen, and the city, in the case that's currently being heard today. I also represented the defendants before the trial court, and so I've lived with this case for a long time. At its court, centered on Officer Moynihan, the actions that he took on two separate dates, and whether those actions entitle him to qualified immunity. The appellant's brief raises two main issues. First, procedurally, whether the district court erred when it considered what that bias alleges were improperly authenticated documents, when it failed to reach out from the bench and counsel her on summary judgment rules, and when it failed to convert her motion to compel Officer Moynihan's deposition into a Rule 56 request for a continuance. And secondly, whether the district court erred substantively when it granted summary judgment to all three of these defendants. All of these issues, whether substantive or procedure, don't rise to the level necessary to disturb a district court's order, and I'd like to discuss the substantive errors first. Officer Moynihan detained bias under Welfare and Institutions Code, the Lanterman-Petras Short Act, Section 5150. California legislators, by necessity, chose to subordinate that the interests of the person described in the Act to the benefits that would inure to them from immediate therapeutic intervention. The standard is probable cause, and it's a probable cause that's akin to warrantless arrests for violations of the Penal Code. It's not identical, however. It was adapted. And what's required, basically, is that the officer must articulate specific facts that a reasonable, prudent person would believe or strongly suspect that the detainee is suffering from a mental defect and is a danger to herself or others or gravely disabled. The officer is not required to make a medical diagnosis, and this is for common sense reasons. He's not a doctor. It's enough that he's able to articulate behavioral patterns that seem bizarre under the circumstances. And here, bias was detained on two separate occasions, and she was detained by Officer Moynihan. On both of these occasions, the record is clear that his actions were reasonable and they were supported by probable cause. Yes, the Act calls for an impingement on personal liberty. Excuse me, but it's a temporary impingement, and it's deemed necessary. Here in 2002, Officer Moynihan was given a suicide letter, and it's clear in his application that he's the officer that went to Bias's apartment that day and questioned her about it. In the letter, it said, if I lose my case, I shall kill myself. Officer Moynihan asked her, did you write this? Did you mean it? And she said, I'll do whatever I want. Officer Moynihan learned that she lived alone. She made the bizarre comment that maybe I'll be killed by terrorists. Officer Moynihan took all of this down, and in his words, he observed Bias appeared emotional and depressed, threatened to kill herself in writing, and said she'd do whatever she wanted to in person. Officer Moynihan took all of these specific and articulable facts, put them down in his application, and had Bias evaluated. And Bias was evaluated and released the same day. The statute worked as it was intended to do. The 2003 detention, Bias triggered that when she approached Moynihan fully dressed in his full police uniform, driving a black and white, and started ranting about people out to get her. Moynihan could not understand what she was saying. The only thing that was coming through loud and clear was that she thought people were out to get her. The more he attempted to question her and get to the bottom of what was going on, the more agitated and upset she became. He began to think that she was maybe suffering from a mental disease and was a danger to herself, if not these other people that she clearly thought were out to get her. He again decided that she needed therapeutic intervention. So as he's filling out the application and explaining this to her, she attacks him, and then she runs away. Officer Moynihan remembers her from the previous 5150. He had all of this in his mind when he decides to have her evaluated for the second time, as the code allows him to do, take into account past behavior of the detainee. Again, Bias was evaluated and released the same day. Moynihan was entitled to qualified immunity for both of these detentions because when a plaintiff alleges that a clearly established right was violated, here we're talking about the Fourth Amendment, the court must determine whether a reasonable officer in Moynihan's position could have believed that he had probable cause. Qualified immunity for peace officer protects those all but the plainly incompetent and those who knowingly violate the law. This means that when you have a constitutional violation, Moynihan could have had a reasonable, even if mistaken, belief about what the law required, and he should still be entitled to qualified immunity. It's clear that not only were his actions reasonable, but both detentions were supported by 5150 probable cause. Bias' rights were secured, Moynihan's actions were reasonable, therefore entitling him to summary judgment. Is it your position that the exemption from liability that the legislature has provided in Welfare and Institutions Code section 5278 is applicable only if the officer can establish probable cause for the detention under section 5150? I don't know if it's actually only if, but in this case, I think it's clear that probable cause was established. And I think the intent of this is to, where qualified immunity really comes into play here, that's where the officer can have the mistaken belief about what the law requires, or even about what the facts are, and he's still entitled to qualified immunity. Well, you're using a term, qualified immunity, that has a very specific jurisprudential meaning under the case law in federal court, and I'm asking whether section 5278 actually affords a different scope of immunity than general qualified immunity under federal law, section 1983. I don't think it's a different scope. I think they work in tandem. And it's certainly true of any other common law state cause of action with regard to police officers specifically. They are entitled, if their actions are reasonable and they're entitled to qualified immunity under federal law, then their actions are deemed reasonable and they're entitled. But that's by case law. There is no analogous provision. Is there under any other California code that affords police officers generally the same kind of protection for arrest based on probable cause for crimes? No. No. In answer to that question, no. This is a very specific situation where the legislature has declared some form of immunity for officers. That's absolutely correct. My question was really based on the language of the statute, and that is whether or not it immunizes the officer from criminal or civil liability for exercising this authority in accordance with the law. And the question that that raised is what law are we talking about? 5150, I'm assuming. Yes, that's absolutely correct. I'm sorry. I should have asked the question a little clearer. Let me see if I understand this colloquially that you two are having. Under 1983 and under qualified immunity as a federal rule, if an officer has reasonable reason to believe that there is probable cause, he has qualified immunity even if, in fact, there is not probable cause. Is that correct? That's correct. Now, the statute that Coleman has been talking about is a state statute. Under that statute, isn't it required that, in fact, there be a showing that there is probable cause? I think that's right, Your Honor, because it's all in the scheme of the 5150 framework. And so the legislators are saying, yes, we think that it's necessary to have this impingement on personal liberty, and we're going to give you police officers immunity when it's carried out correctly. So is it your position that the record shows that there was, in fact, probable cause? Absolutely. Yes, that is my position. And if there aren't any more questions, I'd like to touch on the procedural defects here quickly, if I may. The most important I think is certain. I'll give you a little extra time. There were also state causes of actions. That's correct. As to those state causes of action, the qualified immunity principles in federal cases would not apply. But there is a similar applicable California state law that works in tandem with federal law. And so as long as the officer's actions were reasonable and he's entitled to qualified immunity on the federal level, he's also entitled to qualified immunity from the state causes of action. Only if there was a showing that there was, in fact, probable cause? I don't believe so. It mirrors the federal law. What case are you relying on or statute that supports what you said about state law? If I may, full line. I think in this instance, the most applicable case would be Heater v. Southwood or the People v. Triplet, which is relevant to this discussion in terms of 5150. Can you repeat those cases again? Yes, I'm so sorry. The first is Heater v. Southwood Psychiatric Center, 42 Cal Up 4th, 1068. And the second is People v. Triplet, 144 Cal Up 3rd, 283. 144 Cal Up 3rd, 283. Thank you. Regarding biases attacked procedurally on the district court's order, I think the most important one out of all three is her allegations that the district court considered improperly authenticated exhibits. And the record before the district court is clear that with regard to the two psychiatric detention applications and the suicide letter, all three of these documents were authenticated by either Officer Moynihan, Ms. Bias herself, or the both of them in the record before the district court. Exhibit C is the 2002 psychiatric application. Officer Moynihan authenticated this in his declaration at excerpts of record 182. Exhibit D is the suicide letter. Bias herself authenticated this in deposition testimony that was before the district court in supplemental excerpts of record 242. And Officer Moynihan authenticated this letter in his declaration, excerpts of record 182. Exhibit E is the 2003 psychiatric application. And Moynihan again authenticated this in his declaration, excerpts of record 181 to 182. The fact that all three of these documents were attached to defense counsel's declaration, under the Hal Roach Studios Inc. case, they say this is a technical error not worth remanding for because the people with personal knowledge did authenticate these documents on the record that was before the district court. So I think with all three of these exhibits, there is no error here. And if there was an error, a technical error, it's harmless. It does not mandate overturning what the district court found. Second, regarding Bias' contention that the district court should have reached out and explained summary judgment rules to her, again, this court in the Jacobson v. Filler case said that in the Ninth Circuit, pro se litigants are not entitled to any special treatment over parties represented by counsel. And that to require such a notice would, quote, invite undesirable open-ended participation by the court in the summary judgment process. In other words, it would pull the court out of its neutral position and inject it into the adversaries. Counselor, I think we're pretty familiar with that case. I'd like to go over a little bit here. I'll give you one minute to sum up, and then I'm going to give your opponent a little extra time. Thank you. Just one final point on that. I think the record's clear that even had the district court given Bias such notice in this case, it's difficult to imagine what she would have done differently. She submitted an opposition. Yes, her declarations were late, but the district court still considered them. She submitted everything that she could. The district court committed no errors here, procedurally or substantively. And so their finding of qualified immunity for Officer Moynihan was correct, and their finding of summary judgment for all three defendants was proper. And if there's no more questions, I'll call you to admit. Thank you very much. Thank you. Mr. Tagawa, I'll give you about five minutes. Thank you, Your Honor. Your Honors, I think one of the single most important things that show partiality on the part of the district court is the fact that Judge Armstrong struck Bias' surreply and second surreply briefs, which Ms. Bias attempted or did file, in fact, with the district court prior to the hearing date of the summary judgment motion. And those documents were stricken from the record by the district court and not considered by the district court. And while the district court did consider untimely filed papers by the appellees, which were actually filed after Bias' opposition papers were filed and submitted, the district court refused to consider any additional papers or reply papers to Ms. Bias. And there's no record, there's no evidence of what those papers said. Well, Mr. Tagawa, as I understand it, the local rules of the Northern District of California do not provide for surreply or second surreply briefs. So how did the district court abuse its discretion in enforcing the rule as to extra briefs? Well, I don't think the local rules allow errata either. Errata is not really the same thing, is it? It's simply saying, look, because of a clerical error in the attachment of a piece of paper that was supposed to be an exhibit here, we attached the wrong piece of paper and here's the correct paper. That's not a new argument or an additional argument that wasn't made in the first brief. Isn't there a distinction between the two? I think there is a distinction when you're dealing with a pro se litigant and, again, this is coupled with the fact that you have an attorney who is authenticating documents such as medical records, letters. Maybe I'm not making my question clear. Isn't there a substantive difference between simply filing a piece of paper that corrects, I'll call it a typographical error, it's really a clerical error, and an attempt to file additional briefing that raises new and different arguments than were already raised in the first brief that was filed? How do we know what was in the surreply or the second surreply? I mean, we don't. Are you contending? Those titles were given to those documents by the district court. Are you contending that it was the same thing, that it was simply errata? I am contending that the record is bare. Well, we know what the errata consisted of that the city filed, and they're clearly not additional arguments. So I'm really asking you from a legal standpoint, isn't there a difference between filing of errata and attempting to file something that's other than errata? I think is there a difference from a timeliness standpoint? In my view, they are both untimely. That's not the question. The question is whether there's a substantive difference. I don't understand why you're resisting me so much on this. And I think the answer is yes, there is a difference. Well, because you're asking me about a known quantity, which is the errata, which we have a record of, and we know what that consisted of. There were two of them. Okay, so what's the harm? And we have two unknown quantities, on the other hand, which are the surreply and the second surreply, which we don't know what was in them. Which you conceded is not permitted by the local rule. Well, but neither are errata, in my view. And what's the harm to the plaintiff from the filing of errata that corrects the record so that it's accurate? She has not been given the opportunity to see those papers in connection with this motion. What's the harm in allowing her surreply and second surreply to be considered if, in fact, you know, there is no harm in considering the errata? Is it your position that she had not seen the hospital admission forms and the discovery and litigation? Is that your position? I am not arguing that she had not seen them in discovery. Okay. Let me see if I understand your responses. You're saying that if an attorney was involved and had filed the surreplies, that the local rule would have prohibited that. You seem to say, well, she's a pro se, therefore. I'm trying to understand why you said that. Because it's so confusing for a pro se litigant, especially when there's racial discrimination allegations and maybe the whole communication gap between Moynihan and Bias in the incident or incidents underlying. There are problems with communication. And when you have a pro se litigant who is not familiar with procedures that sees papers being untimely submitted by the moving party, the city, and the police officer, and then the hearing is taken off, and then her papers, which are also untimely filed, are not considered. So are you asking us to create an exception for the local rule, for pro ses? I am. But I'm also asking, you don't have to even go that far. I am asking for even-handed application of consideration of papers. I do think that not holding oral hearings on motions for summary judgment where there are racial discrimination cases does put a higher burden on pro se litigants than other types of pro se litigants, because they have, in addition to their communication barriers, problems in understanding the complexities of summary judgment motions. Yes. Mr. Tagawa, your client was raising her hand. Would you take a minute to confer with her in case she wants to have you say something on her behalf? Thank you. My client wanted to emphasize that the first incident, Mr. Moynihan did not confront her, did not have any personal involvement with her at all, and that was her part. Thank you very much, Mr. Tagawa. The case just argued is submitted, and we'll mount your argument in the case of Darius Gaines versus- Your Honor, may I make one, just one- Sure. 30-second point. You want to make one second? Go ahead. The other point I would make, Your Honor, is that in this record, there are Moynihan's special interrogatories to bias, City of San Leandro's special interrogatories to bias, City of San Leandro's request for admissions to bias, and City of San Leandro's request for production of documents to bias, and bias's verified responses under penalty of perjury to all of these in the record as well, and for the district court to ignore these in connection with this summary judgment motion when they were filed mere months before the hearing, I think is also unfair, prejudicial, and an unequal application of the law. Very well. Thank you very much, counsel. The case that's just argued is submitted, and we'll now hear argument in Darius Gaines.
judges: Alarcon, Tallman, Duffy